Merrimack,
Dec. 5, 1944. } No. 3489.

ALBINA MALTAIS

*v.*

THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES.

ALBINA MALTAIS, *Adm'x v.* SAME.

*Robert W. Upton* and *Laurence I. Duncan* (*Mr. Duncan* orally), for the plaintiff.

*Wyman, Starr, Booth, Wadleigh & Langdell* (*Mr. Booth* orally), for the defendant.

MARBLE, C. J.   The plaintiff assumed the burden of proving that the decedent's death was caused by a non-occupational accident or, in other words, by an accident which did not arise out of and in the course of his employment within the meaning of that phrase as used in the policies.   *Raymond* v. *Company*, 86 N. H. 93; *Trepanier* v. *Insurance Co.*, 88 N. H. 118, 121.   The phrase is common to many workmen's compensation statutes including our own act (R. L., *c.* 216).

The policies were obviously designed to afford a workman protec-

tion (with certain exceptions not here material) in the event of an injury for which his employer was not liable either at common law or under the provisions of chapter 216. But in determining whether or not the plaintiff may recover it should be borne in mind that, although injuries which do not arise out of and in the course of a workman's employment are not compensable under the provisions of our statute, the phrase in question has usually received a very liberal interpretation in recognition of the remedial purpose of the act.

"The injury arises out of the employment when it occurs in the course of the employment and is the result of a risk incident to the conditions under which the employment is performed" (*Mascika* v. *Company*, 109 Conn. 473, 480); and, to quote the language of *Cardozo*, J., in the case of *Leonbruno* v. *Mills*, 229 N. Y. 470, 473, "The risks of injury incurred in the crowded contacts of the factory through the acts of fellow-workmen, are not measured by the tendency of such acts to serve the master's business. Many things that have no such tendency are done by workmen every day."

"The phrase 'in the course of employment' presents two principal questions. The first concerns the period of employment. When does it begin and end, and, during this period, when is its continuity broken? The second raises the question as to how far the servant during the period of employment places himself outside thereof by doing that which he is not employed to do, or by doing his appointed work at a place other than that which his master has appointed for that purpose, or by deliberately adopting a method of performing the work other than that prescribed by his master or forbidden by him." Bohlen, "The Drafting of Workmen's Compensation Acts," 25 Harv. Law Rev. 401, 402.

It is definitely settled in this jurisdiction that the words of the statute do not limit its application to the periods during which the workman is actually engaged upon the work he is hired to perform. *Whitham* v. *Gellis*, 91 N. H. 226, 227, and cases cited. See, also, *Bernier* v. *Mills*, *ante*, 165.

The witness Cutting stated that he had "an exceptionally dusty job" and that there was no blowing system in the room where he worked; that he had been employed by the New England Briar Pipe Company for three years and that whenever he was working on maple pipes he had to remove sawdust from his clothing before lunch and before he went home at night, and that he did this by means of the air hose. He testified: "I used to dust myself off alone if there wasn't anybody around. If there was somebody around

I would ask them to help me. I suppose the others did likewise. . . . I would use it [the hose] because it was necessary on my job, I got so dusty."

The hose was used only for the purpose of removing dust, and it was but natural to suppose that the workmen would use it as they did. Although the pipe company's foreman professed not to know of the workmen's practice of "brushing each other off," he admitted that there was no rule against it, and he couldn't remember whether he had ever "told anyone not to use the air hose to clean themselves off or somebody else off."

As stated in the defendant's brief, the pipe company's workmen were permitted to clean up on company time, the injury to the decedent occurred on the company's premises and before quitting time, and the method of cleaning up was not forbidden. The following language of the opinion in *Whitham* v. *Gellis, supra,* is particularly applicable: "While engaged in employment an employee's conduct in matters of a personal nature reasonably to be undertaken and not expressly forbidden is as much in the course of the employment as when he is actually performing the work of the employment."

The decedent's injuries arose out of his employment if the danger of being injured by the sport of a fellow-workman was "a risk to which he was subjected by the defendant." *Zwiercan* v. *Company,* 87 N. H. 196, 198. See, also, *Fox* v. *Manchester,* 88 N. H. 355, 359.

Whatever workmen are commonly understood to do when associated together in a shop or factory is "part and parcel of the working environment" (*Hartford &c. Co.* v. *Cardillo,* 112 F. (2d) 11, 17) and therefore one of the perils of the service. That workmen are apt "to indulge in a moment's diversion from work to joke with or play a prank upon a fellow workman, is a matter of common knowledge to everyone who employs labor." *Hulley* v. *Moosbrugger,* 87 N. J. Law, 103, 105. *Cardozo,* J., quotes these words in the course of his opinion in *Leonbruno* v. *Mills,* 229 N. Y. 470, 472, and then continues: "The claimant was injured, not merely while he was in a factory, but because he was in a factory, in touch with associations and conditions inseparable from factory life. The risks of such associations and conditions were risks of the employment."

The trend of our decisions is clearly in accord with these views. See *Donovan* v. *Mills,* 90 N. H. 450, 452; *Bernier* v. *Mills, ante,* 165.

Many authorities hold, however, that although an injured work-

man can recover compensation when he is the innocent victim of another workman's prank, his injury cannot be said to arise out of his employment if he was a participant in the sport by which he was injured. Other courts allow recovery despite such participation. The conflicting views are discussed by *Rutledge*, J., in the case of *Hartford &c. Co.* v. *Cardillo, supra*.

As defendant's counsel have pointed out, the decedent was not actively participating in the sport at the moment when the accident occurred, and the most that can be said in the plaintiff's favor on this issue is that the example set by the decedent may have prompted Cutting to do what he did.

The pipe company knew as a matter of common knowledge that there might be brief "lapses from duty" on the part of its employees as in "horseplay, kidding and teasing" (*Hartford &c. Co.* v. *Cardillo, supra,* 16). Such lapses are conditions incident to the service, and for this court to hold that an injury arises out of the employment if it is inflicted on a workman attentive to duty by the sportive conduct of a fellow-employee, but that it does not so arise if the injured workman participates, however slightly, in the sport is to draw a distinction based on the injured workman's fault, when the only faults specifically named in the statute as precluding recovery are intoxication, violation of law, and serious or wilful misconduct (R. L., *c.* 216, *s.* 10).

It could not be found on the evidence that the decedent was guilty of serious misconduct or of any other of the enumerated derelictions. "He was guilty at most of contributory fault." *Hartford &c. Co.* v. *Cardillo, supra,* 18. But this was not sufficient, in view of the provisions of section 10, to defeat his right to compensation under the act.

It follows that the plaintiff's motions for directed verdicts should have been denied and the defendant's motions granted. This conclusion makes it unnecessary to consider the defendant's exception to the exclusion of evidence.

*Judgments for the defendant.*

All concurred.