## BRUCE CUNNING v. CITY OF HOPKINS AND ANOTHER.

103 N. W. (2d) 876.

June 24, 1960—No. 37,917.

*Thomas O. Kachelmacher* and *Gerald B. Forrette,* for relator.
*Robb, Robb & Van Eps,* for respondents.

NELSON, JUSTICE.
Writ of certiorari to review a decision of the Industrial Commission.
Bruce Cunning, employee-relator, Richard Walker, and David Bak-

ken, three young college students, were employed by the Department of Recreation and Parks, city of Hopkins, to do park maintenance work. The department was under the supervision of a Mr. Harris. Relator had been employed by the said department of the city in the winter of 1954 as skating-rink superintendent and annually thereafter between June and September. Walker had worked for the city for the first time in 1957, and Bakken's employment with the city began on July 5, 1958. Relator's employment came to a sudden termination on July 16, 1958, because of the accident resulting in injury involved in the present proceeding.

On that morning the trio had engaged in a general cleanup of equipment and grounds. In the afternoon they picked up two empty barrels which they filled with kerosene to spray fence lines in order to kill weeds. This was to be their afternoon's job. The city furnished a half-ton pickup truck to carry them to the various grounds and parks. Bakken had been designated as the driver. The truck bed was enclosed with sideboards, 14 inches high, and a tailgate of lesser height. They placed the oil barrels in the bed of the truck and relator and Walker sat on opposite sides of the truck bed to steady the barrels. The record indicates that relator sat on the left and Walker on the right in the truck bed, near the cab, to make sure that the barrels would not tip. As they reached a park or playground they would park the truck and engage in spraying fences and weeds. Handling and steadying the barrels in the truck bed while the truck was moving constituted one of their duties.

They first took care of a softball field, then a park, and were on the way to another park when it became necessary to stop for a red light at the intersection of County Road No. 18 and Excelsior Boulevard. Just prior thereto both relator and Walker tossed a playground ball into the cab. Bakken threw one ball back into the truck bed. It bounced into the street and relator retrieved it. Although considerable mention was made of this occurrence at the hearing, the record indicates that this ended when they turned into St. Louis Street.

Both relator and Walker recall that there was a raincoat in the bed of the truck. Relator cannot recall what if anything was done with the raincoat. He has no recollection of continuing the trip after the green light came on.

Walker testified that after the green light came on and they pro-
ceeded on the boulevard and turned into St. Louis Street the going be-
came rough because of the condition of the street and they had to stand
up to guard the barrels and hang onto the sides of the cab. It was at
this time that the relator called Walker's attention to the raincoat. Each
took a hold of a corner of it and flipped it over the roof of the cab. It
stayed that way off and on until the truck got into the first curve in St.
Louis Street, a distance of a block or two. Walker says he let go when
they went into the first curve. He had to hang onto the cab while Bakken
drove into the curve as he was on the right-hand side. The road was
rough, and Walker was looking straight ahead. Shortly after the truck
had turned into the second curve in the street he saw someone motion
to him and, turning around to look, discovered that relator had lost his
balance and fallen out of the truck on the back of his head and
shoulders. Walker then called to Bakken to stop the truck and both ran
back to assist relator. Someone called the city of Hopkins for a rescue
squad. A passing trucker also came to their assistance.

Walker testified that it did not occur to him to throw the raincoat
over the cab initially but that both threw it; that this occurred while they
were standing up because of the chuckholes and the bumpy condition of
the street over which they were driving. He last saw the raincoat when
they went into the first curve; nothing had been said about what to
do with the raincoat, his version being that it was too bumpy and noisy
at the time; when they went into the first curve or turn he had to
hold on because he was on the right side and the turn was made to the
left; the second turn was to the right. Walker testified that Bakken, in
going into the second turn, took it rather suddenly and sharply; that it
was a sharper curve; that the cab window was open on the side on
which he was standing and he was forced to hang onto it. He says that
he was pulled to the left when the corner was taken.

Bakken's testimony coincides with that of relator and Walker as to
what occurred until such time as they made the stop for the red light.
Bakken states they had traveled some 6 or 7 blocks on St. Louis Street
after that stop before the accident occurred; that he was familiar with
the street and the turns; that the raincoat was thrown over the top of

the cab as he was driving across railroad tracks; that he did not know who did it. When he was asked what he did after this occurred, he said he proceeded with his driving and that his vision was obscured only at times, and then for a fraction of a second because the wind kept flapping the raincoat; that he proceeded this way until he entered the second turn in the road, having driven that way possibly 3 or 4 blocks. He states that his vision was not completely obscured when he came to the first turn, only partially; that the wind was flapping the raincoat up and down when he came to the second turn; that he had gotten over the centerline and turned sharply in order to get back to the right side of the road. Bakken was asked several times as to his driving speed. He answered on each occasion that it was 20 to 25 miles per hour and that he attempted to make the turns in the road at that speed. There is no testimony that he reduced the speed on account of chuckholes or bumpy street surfaces. He admits that in going into the turn immediately preceding the accident it was very bumpy; that he drove approximately 50 yards after relator had fallen out of the truck; and that Walker pounded on the back windshield to call his attention to what had occurred.

During the hearing Bakken testified as follows on redirect:

"Q. Mr. Bakken, I have a few further questions. First of all, to straighten out a particular point, you said the windshield was never completely covered—completely, I mean both portions of the glass in front of the truck?

"A. No, sir, it was never.

\* \* \* \* \*

"Q. You stated that your speed was 20 to 25 miles an hour?

"A. Yes, sir.

"Q. And you also stated that the road was bumpy?

"A. Yes, sir.

"Q. And your observation also was that there was no traffic or relatively no traffic?

"A. Yes, sir.

"Q. And you took the turn at that speed, 20 to 25 miles per hour?

"A. Yes, sir.

"Q. Mr. Bakken, do you know for a fact who threw the coat or who blinded your vision with the coat?

"A. No, sir, not for a fact.

"Q. Do you know if the coat was being held there by anybody or whether the wind was holding it there?

"A. I believe the wind was holding it there.

\* \* \* \* \*

"Q. But at no time from the time the raincoat came over the windshield until Mr. Walker pounded on the window for you to stop did you make any observation through the back window, is that right?

"A. To my knowledge, I didn't."

The issues involved appear to be whether relator's injury is one "arising out of" and "in the course of" his employment so that he is entitled to compensation within the meaning of M. S. A. 176.021,[1] and whether or not so-called "horseplay" is a defense to an award of compensation under that section.

Section 176.011, subd. 16, provides:

" 'Personal injury' means injury arising out of and in the course of employment and includes personal injury caused by occupational disease; but does not cover an employee except while engaged in, on, or about the premises where his services require his presence as a part of such service at the time of the injury and during the hours of such service. *Where the employer regularly furnished transportation to his employees to and from the place of employment such employees are subject to this chapter while being so transported, but shall not include an injury caused by the act of a third person or fellow employee in-*

---

[1]M. S. A. 176.021, subd. 1, reads as follows: "Except as excluded by this chapter all employers and employees are subject to the provisions of this chapter. Every such employer is liable for compensation according to the provisions of this chapter and is liable to pay compensation in every case of personal injury or death of his employee arising out of and in the course of employment without regard to the question of negligence, unless the injury or death was intentionally self-inflicted or when the intoxication of the employee is the proximate cause of the injury. The burden of proof of that fact is upon the employer."

*tended to injure the employee because of reasons personal to him, and not directed against him as an employee, or because of his employment."* (Italics supplied.)

The facts in the instant case clearly indicate that the injury to relator occurred in the course of transportation of the employees from place to place and that it arose out of and in the course of employment.

Where transportation is furnished by an employer as an incident of the employment, it is generally held that an injury to or death of an employee going or coming in the vehicle so furnished by the employer, and under his control, arises out of and comes within the course of the employment within the meaning of the Workmen's Compensation Act. See, State ex rel. London & L. Ind. Co. v. District Court, 141 Minn. 348, 170 N. W. 218; Workman v. Endriss, 164 Minn. 199, 204 N. W. 641.[2] Of course, the injury must arise out of and in the course of employment since the statute limits liability to cases where personal injury or death of employee arises out of and in the course of his employment.

Respondents argue that because the accident resulted from "horseplay" in which relator was a participant it did not arise out of his employment.

This court in Petro v. Martin Baking Co. 239 Minn. 307, 58 N. W. (2d) 731, held that since the legislature did not provide that aggression, willful misconduct, unlawful conduct, or willful intent to injure another is a defense to recovery of workmen's compensation, the supreme court will not read such defenses into the act. It was also held that the language of § 176.021, subd. 1, excepting from compensation injury or death which is "intentionally self-inflicted" contemplates a deliberate intent on the part of the employee to cause injury or death to himself, not a failure on his part to realize the probable consequences to himself of his foolish acts.

In the Petro case there was a physical encounter between Petro and Stokes, employees of the baking company. Petro was a driver-salesman

---

[2]See Annotations, 10 A. L. R. 169, 21 A. L. R. 1223, 62 A. L. R. 1438, and 145 A. L. R. 1033, on the subject of employee riding to or from work in employer's conveyance; 21 Dunnell, Dig. (3 ed.) § 10403(15), and cases cited.

and Stokes was a supervisor over the driver-salesmen. A dispute arose because Stokes had accused Petro of stealing some bags out of his truck. One charge led to another. Two days after Stokes made the accusations, Petro returned from his route to the company garage and while he was unloading his truck the encounter occurred. There was an attempted exchange of blows; the men grappled and fell to the floor. Clearly, Petro was the aggressor. They continued scuffling until Stokes got on top of Petro. The men were separated and Petro returned to his truck and Stokes left the scene. Stokes returned shortly. The two men again grappled, fell to the floor, scuffled for a few minutes, and then separated. This was the second encounter. The owner and manager was summoned to the garage and ordered Petro and Stokes to stop arguing. He directed them to step into the sales manager's office in an attempt to straighten things out and to settle their differences. During the discussion Petro suddenly slumped back on the settee in the office, suffering from a heart attack. In a few minutes he was dead. The referee determined that Petro's death resulted from an accidental injury arising out of and in the course of his employment and awarded compensation; the Industrial Commission affirmed. As a result we had for the first time in this jurisdiction the issue whether a so-called "aggressor" in a work-connected altercation might recover workmen's compensation for injuries received in the altercation. This court held that the Industrial Commission should be affirmed. Three justices dissented, partly on the theory that the encounter did not arise spontaneously out of something said on the job and that therefore injuries suffered could not be said to arise out of and in the course of the employment, and partly on the ground that the holding was contrary to the weight of authority. The majority gave consideration to whether the compensation act provides a defense against recovery of an award by an aggressor or his dependents. It reasoned that the only statutory defenses that bar an award of compensation for injury or death of an employee caused by an accident arising out of and in the course of his employment are the two contained in the statute (§ 176.021, subd. 1), namely, (1) injury or death which is intentionally self-inflicted and (2) injury or death naturally or proximately caused by the intoxication of the employee. No question of

intoxication was raised. The insurer and the employer contended that, where a man who knows that he is suffering from a heart condition and who must know that an assault will be resisted nevertheless initiates such assault, the injuries to him resulting from the assault are "intentionally self-inflicted," but this court said (239 Minn. 314, 58 N. W. [2d] 736):

"* * * *In our opinion, however, the statutory language contemplates a deliberate intent on the part of the employee to cause injury or death to himself, not a failure on his part to realize the probable consequences to himself of his foolish acts.*" (Italics supplied.)

The employer and insurer in that case contended that the legislature, by providing the defense of intoxication, had indicated that it had not excepted willful or unlawful misconduct from those things which are proper defenses in a compensation proceeding and that a reasonable interpretation of the law, based upon sound public policy, required an adoption of the aggressor defense. To this the majority did not agree. It held that the legislature has specifically provided the two defenses mentioned above and it has not provided that aggression is a defense, and it has not provided, as some other states have, that willful misconduct, unlawful conduct, or willful intent to injure another is a defense. This court stated (239 Minn. 315, 58 N. W. [2d] 736): "*Under these circumstances we will not read such defenses into the act. If the legislature has gone too far in removing contributory fault as a factor in workmen's compensation, it is for the legislature to correct that action*" (italics supplied), *and the majority refused to reverse the decision of the Industrial Commission.*

The employer and insurer in the Petro case also attempted to bring it within a statutory exclusion by virtue of the phrase "personal injuries arising out of and in the course of employment." This exclusion is found in § 176.011, subd. 16, which provides that the phrase in question shall not include:

"* * * an injury caused by the act of a third person or fellow employee intended to injure the employee because of reasons personal to him, and not directed against him as an employee, or because of his employment."

This court refused to follow this contention, stating that the argument was (239 Minn. 313, 58 N. W. [2d] 736):

"* * * based upon the assumption that dispute between the two men was a personal grudge fight, initiated by decedent and defended by Stokes, which did not arise out of the employment because it was too remote from the work-connected accusations. It has thus been disposed of by the commission's finding and the foregoing discussion. The cases of Goodland v. L. S. Donaldson Co. 227 Minn. 583, 36 N. W. (2d) 4, and In re Wooley v. Minneapolis Equipment Co. 157 Minn. 428, 196 N. W. 477, cited by the employer and its insurer, are distinguishable on their facts."

It is no doubt true that the majority of jurisdictions that have passed upon the question involved in the Petro case have refused compensation to an "aggressor" even though the dispute was work-connected, but this was done by some courts on the theory that the injury did not arise out of the employment and by others because of statutory defenses granted to the employer. This court chose in the Petro case, however, to follow the lead of four jurisdictions which granted compensation to persons injured in work-induced disputes without regard to the fact that they were aggressors, and clearly stated that the reasoning of the following jurisdictions was preferred: State Comp. Ins. Fund v. Industrial Acc. Comm. 38 Cal. (2d) 659, 242 P. (2d) 311; Dillon's Case, 324 Mass. 102, 85 N. E. (2d) 69; Newell v. Moreau, 94 N. H. 439, 55 A. (2d) 476; Matter of Commr. of Taxation & Finance v. Bronx Hospital, 276 App. Div. 708, 97 N. Y. S. (2d) 120. As pointed out in the Petro case it appears that basic to the conclusions reached in the foregoing decisions is the reasoning of Mr. Justice Rutledge, then of the United States Court of Appeals for the District of Columbia, in Hartford Acc. & Ind. Co. v. Cardillo, 72 App. D. C. 52, 112 F. (2d) 11, a case in which the claimant was not an aggressor. Mr. Justice Rutledge reasoned that a dispute between employees is not necessarily disconnected from their work because it has no relevancy to the immediate task or tendency to further the work, involves a lapse from duty, or contains an element of volition, illegality, or personal anger. The fundamental question is whether the claimant was injured, not

merely while he was at his employment, but because he was at his employment, in touch with associations and conditions inseparable from it. The following comment from Mr. Justice Rutledge's opinion has found acceptance in liberalizing the application of compensation laws (72 App. D. C. 56, 112 F. [2d] 15):

"* * * the environment includes associations as well as conditions, and * * * associations include the faults and derelictions of human beings as well as their virtues and obediences. Men do not discard their personal qualities when they go to work. Into the job they carry their intelligence, skill, habits of care and rectitude. Just as inevitably they take along also their tendencies to carelessness and camaraderie, as well as emotional make-up. In bringing men together, work brings these qualities together, causes frictions between them, creates occasions for lapses into carelessness, and for fun-making and emotional flare-up. Work could not go on if men became automatons repressed in every natural expression. 'Old Man River' is a part of loading steamboats. These expressions of human nature are incidents inseparable from working together. They involve risks of injury and these risks are inherent in the working environment."

The position taken in the four jurisdictions referred to in the Petro case have received the approval of leading commentators in the field of workmen's compensation. See, Horovitz, *The Litigious Phrase: "Arising out of" Employment,* 4 NACCA L. J. 19, 47, 53; Horovitz, *Assaults and Horseplay Under Workmen's Compensation Laws,* 41 Ill. L. Rev. 311.

In Newell v. Moreau, 94 N. H. 439, 55 A. (2d) 476, the court pointed out that New Hampshire was one of the first (1911) states to adopt a valid workmen's compensation act and that some features of the New Hampshire act were unmistakably moulded after the British act of 1906 (6 Edw. 7, c. 58). Section 1(2) (c) of the British act provided that compensation was disallowed (except in certain circumstances) for injury attributable to a workman's "serious and wilful misconduct," the New Hampshire act containing this phrase in the disjunctive. Rev. Laws of N. H. 1942, c. 216, § 10. In considering the meaning of this provision the court made it clear that misconduct itself

is not a bar to compensation; that under the British act to have that effect misconduct must be both serious and willful, and that under the New Hampshire act it could be either; that the word "wilful" imports deliberate conduct, not merely a thoughtless act on the spur of the moment, and that the word "serious" imports, not that the actual consequences were serious, but that the misconduct itself was so and that the misconduct must therefore be grave and not trivial. Mr. Justice Kenison, speaking for the court in the Newell case, said (94 N. H. 444, 55 A. [2d] 481):

"* * * the effect of defendant's argument is that plaintiff was hired to work and not to fight and that this was wilful misconduct precluding recovery under the statute. While this argument has an appealing quality to it, it has not been followed in analogous cases and it proves too much. Employees are also hired to work and not to scuffle, commit batteries or engage in horseplay * * * nor to depart from the work routine to make a personal purchase of tobacco * * * nor to make other departures from the hired work. * * * Yet, in all these cited cases compensation or recovery was allowed because it was such conduct of employees as could be reasonably expected and therefore was adjudged incidental to the employment. The inevitable result of associating men together in work is the same stress and strain that affect human mortals generally. Arguments, horseplay and some deviation from the planned schedule are bound to occur; they are compensable (and not necessarily considered wilful) when related to the work. That an assault may arise from an argument, is to be expected as much as that *a battery will occur from horseplay. There is no logical reason for recovery in one case and denial in the other so long as the injury or death is the result of the employment* * * * . * * * such conduct is ' "part and parcel of the working environment" * * * and therefore one of the perils of the service.' * * *

* * * * *

*"We must constantly remember that in this case we are construing a compensation statute.* 'Since the employer may be in no way to blame or have anything to do with the injury, the liability to compensate for it is in no usual sense tortious in character.' * * * We should not insert

the conception of contributory fault which the compensation statute discarded and which is not a bar under section 10. * * * We prefer a liberal construction of the statute consistent with its history and general policy rather than a strict and literal interpretation based on the tort law of master and servant." (Italics supplied.)

In Maltais v. Equitable Life Assur. Society, 93 N. H. 237, 242, 40 A. (2d) 837, 840, referred to and followed in the Newell case, the New Hampshire court, speaking of sportive conduct of a fellow employee, said:

"* * * Such lapses are conditions incident to the service, and for this court to hold that an injury arises out of the employment if it is inflicted on a workman attentive to duty by the sportive conduct of a fellow-employee, but that it does not so arise if the injured workman participates, however slightly, in the sport is to draw a distinction based on the injured workman's fault, when the only faults specifically named in the statute as precluding recovery are intoxication, violation of law, and serious or wilful misconduct * * *.

"It could not be found on the evidence that the decedent was guilty of serious misconduct or of any other of the enumerated derelictions. 'He was guilty at most of contributory fault.' * * * But this was not sufficient, in view of the provisions of section 10, to defeat his right to compensation under the act."

The record in the instant case will not support a finding that the accident occurred outside of the period of relator's employment or that he was not at the time performing any duty owing to his employer. The record is clear that he was injured while at a place where his duties required him to be. There being no conflict in the evidence, the conclusion to be reached here is one of law.

The prank that was played with the raincoat will not and cannot be stamped as deliberate, serious, or willful misconduct or willful intention to injure anyone. The statutory exceptions to be found in §§ 176.011, subd. 16, and 176.021, subd. 1, simply do not apply in the instant case. The history of the legislation resulting in our Workmen's Compensation Act, and the beneficial and humane purposes intended by the statute, call for a liberal construction of this law. Clearly, the legislature never

intended that the injured employee should be met in his application for compensation with stringent and technical rules and regulations. It was the legislative intent from the beginning that he should receive his just deserts without the burden of expensive litigation. The amount of recovery which the act prescribes may well be more limited than under common law. The legislative policy implicit in the adoption of the act was that, though limited, the recovery would be more certain, speedy, and definite and the protection to the worker against the ravages of injury, more inclusive. The right to compensation does not arise out of tort, but exists by reason of the Workmen's Compensation Act. Kaletha v. Hall Merc. Co. 157 Minn. 290, 294, 196 N. W. 261, 262.

Whatever may have contributed to the injury received by relator, it resulted in part or in whole from a risk incidental to the employment, and the fault he may have been guilty of does not deny him the protection which the Workmen's Compensation Act affords him as a worker. If he was guilty of misconduct by participating in horseplay, that misconduct does not come within the exceptions which the act says shall be grounds for denial of relief. Clearly, an assault due to horseplay or larking may be as incidental to the working environment as a work-induced assault arising from anger or resentment. The doctrine that horseplay arises out of the work environment, and hence arises out of and in the course of employment, was long ago given vitality by a great jurist, Mr. Justice Cardozo, in Leonbruno v. Champlain Silk Mills, 229 N. Y. 470, 128 N. E. 711, 13 A. L. R. 522.[3] We think that since the advent of the Petro case the time has come to follow those authorities which hold that playful fault is immaterial under the Workmen's Compensation Act—an act which everyone agrees was designed for a

---

[3]Also see, Cassell v. United States F. & G. Co. 115 Tex. 371, 283 S. W. 127, 46 A. L. R. 1137; Chicago, I. & L. Ry. Co. v. Clendennin, 81 Ind. App. 323, 143 N. E. 303; Pacific Employers Ins. Co. v. Industrial Acc. Comm. 26 Cal. (2d) 286, 158 P. (2d) 9.

On the question of whether horseplay arises out of the employment and should be compensable, see Notes: 4 Tex. L. Rev. 537; 9 N. C. L. Rev. 105; 46 Harv. L. Rev. 166; 10 Rocky Mt. L. Rev. 272; 16 Chicago-Kent Rev. 415; 33 Calif. L. Rev. 458; and 77 Irish L. Times 293. See, also, Note: 15 Australian L. J. 149.

more equitable distribution of the economic burden of workmen's injuries. Whatever simple or practical joke may have been indulged in in the instant case it was not a planned act as the record makes clear. To hold here that relator is barred from recovery would be to readopt the old fellow-servant doctrine, dressing it up in a new garb and permitting it to parade through our compensation statutes under the new name of "horseplay," something which the legislature did not intend. When the Workmen's Compensation Act was last revised in 1953 it was known that the courts had differed as to whether participants in horseplay or aggressors should be denied recovery. This court has now spoken in the Petro case with regard to aggressors, willful misconduct, and causation, and it has said that if compensation is to be denied under such circumstances it must be because of some other express exception specified in the act. The exceptions contained in our statute relate to injuries caused by another employee or a third person for personal reasons (§ 176.011, subd. 16) and self-inflicted injuries or injuries of which intoxication is the proximate cause (§ 176.021, subd. 1), and the term horseplay cannot be read into it as another exception or another defense.

The facts in the instant case should be viewed in the light of modern compensation thinking, which recognizes that the risk of assaults, whether malicious or sporting, is incidental to employment. Therefore, assaults, whether growing out of a work quarrel as distinguished from a purely personal argument, or whether arising from frolicking, larking, or horseplay which is a part of the employment environment, do not justify a denial of compensation under the exceptions written into our Workmen's Compensation Act. The determination of whether it arose out of the employment must be based upon the character and the nature of the assault. Which one started it is not material. The gross negligence of an employee is not a defense to an employer. Neither does the gross negligence of an employer in most jurisdictions increase the employee's rights to compensation. It is true that the employee's culpability in aggression, short of willful misconduct, in many jurisdictions has been given judicial sanction as a defense without legislative basis. The setting up of such a defense in the instant case finds

no basis in the Workmen's Compensation Act of this state. This court has said that it will not read such defenses into the act and that, if by chance the legislature has gone too far in removing contributory fault as a factor in workmen's compensation, it is for the legislature to correct the situation.

The burden in the instant case is upon respondents to sustain their claim that relator's alleged misconduct was of such serious, grave, and willful nature as to come within some express exception granted by the act. Short of this, relator is entitled to the protection of the act whether his participation in the raincoat episode was either malicious or sporting.[4]

---

[4]See, Riesenfeld, *Forty Years of American Workmen's Compensation,* 35 Minn. L. Rev. 525, 547, and cases cited in notes 127 and 128.

See Bohlen, *A Problem in the Drafting of Workmen's Compensation Acts,* 25 Harv. L. Rev. 517, 543, where the author discusses the provision denying compensation to workmen guilty of serious and willful misconduct as follows: "The trend of recent American legislation appears on the whole to be against such a limitation of compensation. Many of the more recent acts, enacted and proposed, expressly deny compensation only where the injury is intentionally self-inflicted, and in some cases where it is due to intoxication, deliberately rejecting serious and wilful misconduct as a bar to compensation. The omission of this phrase indicates an intention to regard fault on the part of the workman as utterly immaterial. It is, therefore, even more obviously unwise to adopt in such acts the phraseology of the English act."

See 38 Minn. L. Rev. 83, 85, discussing Petro v. Martin Baking Co. 239 Minn. 307, 58 N. W. (2d) 731: "An additional complicating factor existed in the instant case in that two days elapsed between the accusations which provoked the assault and the actual altercation. It has been reasoned frequently that even a very short time lapse ipso facto transforms a work-induced dispute into a non-compensable personal affair. But if there is no evidence of factors apart from the employment which have contributed to the fracas, there is no reason why a mere time interval should have any effect in determining whether the assault resulted from the employment. For in that case the injury is, to the rational mind, causally connected and attributable to the employment.

"It is extremely unrealistic to contend that the instant decision will encourage employee disputes and misconduct. Instead, the Minnesota court has advanced another step toward the goal of workmen's compensation

Mr. Justice Stone in Hanson v. Robitshek-Schneider Co. 209 Minn. 596, 297 N. W. 19, refers to the significance of the fact that in defining compensable accident the Workmen's Compensation Act makes no mention of cause or causation as such. He stresses that it therefore impliedly rejects or at least modifies the standard of proximate causation determinative in tort litigation and suggests that care must be exercised lest long judicial habit in tort cases allows judicial thought in compensation cases to be too much influenced by a discarded or modified factor of decision.

The Petro case clearly indicates that there are no statutory exceptions in the Workmen's Compensation Act which justify a denial of relator's right to compensation on the record in the instant case. This solution of the problems presented in the instant case finds support in the Kaletha, Hanson, and Petro decisions.

The referee in the instant case denied relief to relator; the Industrial Commission affirmed the findings of the referee by a vote of 2 to 1, writing both a majority and a dissenting opinion. We agree with the overall conclusions reached by Commissioner Robert E. Faricy in his dissenting opinion.

The order of the Industrial Commission is reversed and the commission is hereby directed to make the proper award, consonant herewith, to relator. Relator is allowed $300 as attorneys' fees incident to proceedings in this court.

Reversed and remanded with directions.

DELL, CHIEF JUSTICE (dissenting).

In my opinion the injuries sustained by the employee did not arise out of his employment. They occurred because of the "horseplay" in which he was engaged, and that did not come about because of his

---

legislation—to shift the cost of work-injuries to the industry—and has disposed of another unjustified common law restriction."

See 38 Minn. L. Rev. 86, note 24, which states: "Since the same basic question is involved when a participant in horseplay, as distinguished from the innocent bystander, is seeking recovery, see Newell v. Moreau, 94 N. H. 439, 441, 55 A. 2d 476, 479 (1947), the instant case should settle that problem in Minnesota as well."

work. I believe the case was properly decided by the majority of the Industrial Commission as well as its referee. I, therefore, dissent.